ASSOCIATED HARDWARE SUPPLY CO.

v.

The BIG WHEEL DISTRIBUTING COMPANY, Appellant.

No. 15278.

United States Court of Appeals Third Circuit.

Argued Nov. 2, 1965.

Decided Dec. 27, 1965.

As Amended Feb. 3, 1966.

Gilbert J. Helwig, Pittsburgh, Pa., (Paul J. Winschel, J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellant.

Samuel Kaufman, Pittsburgh, Pa. (Sholom D. Comay, Kaufman & Kaufman, on the brief), for appellee.

Before STALEY and FREEDMAN, Circuit Judges, and COHEN, District Judge.

STALEY, Circuit Judge.

This appeal raises several complex questions involving the Uniform Commercial Code as adopted in Pennsylvania, 12A Purdon's Pa.Stat.Ann. § 1–101 et seq., and the Federal Rules of Civil Procedure, 28 U.S.C. Due to the peculiar substantive issues presented and because the appeals are from both the entry of summary judgment and an order denying a motion to amend the pleadings and for "reconsideration" of the court's order granting summary judgment, the facts must be recited at some length.

During the latter part of 1961, Irvin Molever began to entertain the idea of

opening a discount house retail business in Wheeling, West Virginia. At that time he came in contact with Ernest Berez, a long-time friend and Vice-President of the Associated Hardware Supply Company, a Pennsylvania corporation and wholesaler of hardware, household goods and other merchandise. Molever incorporated his business in West Virginia under the name of The Big Wheel Distributing Company, and as its representative attempted to negotiate a contract with Associated. Several meetings between the representatives of both corporations were held in the early months of 1962. The primary topic of discussion at these meetings was the method of pricing to be used. Big Wheel insisted that the prices be computed on a cost plus ten percent basis for shipments from Associated's warehouse and cost plus five percent for direct factory shipments. Associated maintained that it could not price goods on this basis because its IBM billing system was geared to discount pricing. Big Wheel alleges that at this time it was told by Associated that the dealer-catalogue less 11% method was equal to the cost plus method it desired. These discussions culminated in an exchange of letters between the parties; the letter from Associated on February 9, 1962,[1] confirmed an offer made at one of these meetings; the reply from Big

1.

"February 9, 1962

"Mr. Irving Molever
400 Carlton House
Pittsburgh, Pa.

"Dear Mr. Molever:

"We wish to confirm the special offer that we have made to you for the purpose of supplying your new promotional department store, 'The Big Wheel', in Wheeling, W. Va.

"Specifically, we have agreed to do the following:

"We will make available to you on a maximum 48 hour shipment schedule all merchandise from our Pittsburgh warehouse at the same low price that appears in our dealer catalogue. In addition, you will receive 11% beyond these prices as cash discount. Further, we shall make available to you the merchandising services of our organization as they are presently available to all regular dealer accounts. There will be no additional rebates on purchases beyond these discounts. This offer is subject to your purchasing an average of approximately $5,000 per week in carton lot quantities to be delivered at one time from our Pittsburgh warehouse. All merchandise is sold FOB Pittsburgh.

"Factory shipments which we make at your direction, are available to you on the basis of our normal dealer cost plus the additional 11% cash discount.

"Should we be willing to sell an additional operation of this type, this same offer and schedule of prices would be available to them providing they meet all other requirements.

"In return you have agreed to do the following:

"The initial order of merchandise which we ship at your direction is to be paid less the preferential 11% discount as noted above upon receipt of the mechandise. You have agreed that all invoices from the first through the twenty-fourth of the month will be paid by the 5th of the following month. Invoices from the twenty-fifth through the thirty-first of the month are to be considered as having been shipped as of the next month.

"Since we have asked for no financial information on this new corporation, you have agreed to be personally responsible for all credit regardless of amounts that we extend to this corporation.

"We further ask that you do not make public the arithmetic of this special offer.

"We would appreciate your acknowledging these conditions, and returning a copy for our files.

"Very Sincerely Yours,

ASSOCIATED HARDWARE SUPPLY CO.

/s/ ERNEST S. BEREZ

Ernest S. Berez

Vice President"

"Agreed: /s/ IRVING MOLEVER

Irving Molever

"ESB/o"

Wheel on February 24 [2] impliedly agreed to some of the confirmation but explicitly rejected the method of pricing contained therein. However, either sometime prior to or shortly after sending its letter of February 24, Big Wheel placed an order with Associated for a large quantity of goods which was included in the store's inventory when it opened on March 5. The price paid for the original shipment and for every shipment received thereafter for the next two years was computed on a dealer catalogue less eleven percent basis.

Sales made during this period were not without complaint. As early as August, 1962, Big Wheel began to doubt that the prices it was paying were the equivalent of cost plus 10% on warehouse shipments and cost plus 5% on direct factory shipments. By the following March, at least one of Big Wheel's officers was certain that the prices charged by Associated were considerably higher than cost plus ten percent. These objections were communicated to Associated, which allegedly assured Big Wheel that the prices paid would average out to cost plus 10%.

In spite of its objections to the pricing method, Big Wheel continued to order, receive and pay for merchandise on a dealer catalogue less eleven percent basis until March of 1964. From March through June of 1964, Big Wheel placed orders and received the goods but refused to pay for the merchandise received. In July, Associated commenced this action by filing a complaint in foreign attach-

2.                                                               "February 24, 1962

"Mr. Ernest S. Berez
Associated Hardware Supply Co.
1020 Saw Mill Run Blvd.
Pittsburgh 26, Pa.
"Dear Ernie:

"In reply to your letter of February 19 [sic], I cannot possibly sign this and return it.

"In the first place, I have talked to some of my other suppliers and, quite frankly, I am still at a loss to understand why you can't set up your bookkeeping and administrative procedures similarly to theirs.

"I have discussed this matter thoroughly with Fred, and he is very much concerned that with the inexperienced help we have in your departments much confusion and loss of time will be the results if you bill us at catalogue prices, less an 11% credit memo. You can certainly appreciate his problems. Therefore, if your invoices would come in, similar to Stem Distributing Co., simply at cost, plus 10% it would certainly simplify our pricing procedure at floor level and expedite our getting the merchandise on the floor priced for sale.

"Ernie, I can appreciate your problem of the retails already set up on your I.B.M. cards for your dealer accounts—however, it is incomprehensible to me as a C.P.A. to believe that merely hand-billing our invoices would result in the necessity of hiring another girl—especially when you must consider the time consumed in preparing the 11% credit memos on the method you have suggested.

"Fred is still so concerned about the confusion which will result in our pricing the goods on the floor that I should like to repeat my statement of the other day; that is, go ahead and bill us on a simple cost plus basis, and if you find it necessary to hire a full-time girl we will either absorb a pro rated share of her salary, or make some alteration of invoicing to ease your situation.

"I might add that Fred is also concerned in view of the Robinson-Pactman [sic] Act that we would not be able to sign your letter without consulting legal counsel.

"Since I promised to personally guarantee credit until our current financial statement is finished if you will please send a corrected request I will execute it and return.

                         "Very truly yours,
                         THE BIG WHEEL DISTRIBUTING CO.
                               IRVING M. MOLEVER
                                             President"

"IMM:bg"

ment in the Court of Common Pleas of Allegheny County, Pennsylvania, claiming that it was due $40,185.62 under its contract of sale, which it maintained was embodied in its letter of February 9. See footnote 1, supra.

Big Wheel's petition for removal under 28 U.S.C. § 1441 was granted, and it filed an answer and counterclaims. In its answer Big Wheel alleged: (1) that it was not liable on any contract because the goods were improperly priced and because Exhibit A of the complaint (February 9 letter) had never been signed by any representative of the defendant;[3] (2) that the price basis to which the defendant had agreed was fraudulently induced by plaintiff's material misrepresentation that dealer catalogue less 11% was equal to cost plus 10% on warehouse shipments and cost plus 5% on factory shipments. In its counterclaims Big Wheel alleged that it was entitled to recover for breach of contract in several particulars and for the fraudulent inducement of all previously executed sales between the parties.

Prior to the completion of discovery, Associated moved for summary judgment on the complaint and for dismissal of the counterclaims. After a hearing, the district court on January 7, 1965, entered summary judgment for Associated in the amount of $40,185.62 and dismissed the counterclaims. On January 18, Big Wheel moved for leave to file an amended answer and counterclaims and for reconsideration of the court's earlier order for entry of judgment. The district court's order denying this motion and its summary judgment have both been appealed.

The first matter to be resolved is whether a contract existed and, if so, on what terms. The parties agree that the proper substantive law governing these

determinations is embodied in the Sales Article of the Uniform Commercial Code (1957 ed.) as adopted in Pennsylvania, 12A Purdon's Pa.Stat.Ann. § 2–101 et seq. (hereinafter referred to as "UCC").

■ Two questions involving the interpretation and application of the Code were raised in the district court and argued here. The first of these concerns the Sales Article's statute of frauds, UCC § 2–201. It has been argued that the goods sold between March and June, 1964, were personalty, the price of which exceeded $500.00, and must be represented by a writing. This issue is readily resolved by either of two subsections of UCC § 2–201. First, it is not disputed that the goods have been received and accepted by the defendant. This being so, the transaction is clearly without the statute of frauds, UCC § 2–201(3) (c). Even if this were not so, it is also admitted that Big Wheel received invoices for the sales in question which contained the letterhead of Associated, the quantity and price terms. Because it is clear that the parties are "merchants" within the meaning of the Code, UCC § 2–104(1), and since no written objections to the invoices were sent within ten days of their receipt, the statute of frauds is satisfied. UCC § 2–201(2).[4]

■ The second and perhaps more difficult question is whether the March-June, 1964, sales or any of the sales between the parties are represented by corresponding confirmatory memoranda or other writing "intended by the parties as a final expression of their agreement." UCC § 2–202. Although this problem is more directly related to the defenses and counterclaims of Big Wheel insofar as whether evidence of prior oral agreements is admissible, the parol evidence

---

3. The plaintiff admits that it does not have possession of a signed copy of the letter, and the conformed signature of Mr. Molever appearing on the letter quoted at footnote 1 was eliminated by amendment.

4. Comment 3 to this section points out that the failure to object merely eliminates the statute of frauds as a defense and that proof that a contract was in fact made still remains.

rule is a substantive rule of contracts,[5] and consequently, will be discussed here.

■ Appellant contends, and we agree, that the intent of the parties that a writing be a final expression of their agreement is normally a question for the jury. However, we also believe that where a question of law is presented, it may be properly disposed of on summary judgment. The question presented here is not whether the parties intended either the invoices or the letter of February 9 as a final expression of their agreement,[6] but rather, if, in fact, the parol evidence rule is applicable.

■■ Prior to the adoption of the Code in Pennsylvania, the limitations of the parol evidence rule had been clearly enunciated. The landmark case of Gianni v. R. Russell & Co., 281 Pa. 320, 126 A. 791 (1924), established the scope of the rule. Perhaps the present state of the law was most succinctly expressed in Universal Film Exchanges, Inc. v. Viking Theatre Corp., 400 Pa. 27, 35, 161 A.2d 610, 616 (1960), affirming per curiam on the opinion of the trial court:

"Ever since the leading case of Gianni v. R. Russell & Co., Inc. * * * it has been well settled law in Pennsylvania that:

" ' "Where parties, *without any fraud or mistake*, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement:" * * * "all· preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract * * * and *'unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by pa-*

*rol evidence.' " ' "* (Emphasis supplied.)

See also International Milling Co. v. Hachmeister, Inc., 380 Pa. 407, 110 A.2d 186 (1955). The Code parol evidence rule, UCC § 2–202, contains no prefatory clause such as "in the absence of fraud, accident or mistake." Associated maintains that the absence of such a clause precludes the application of the exceptions found in the well settled law of Pennsylvania. Absent some overriding rule of interpretation, the position taken by appellee might well be correct since the parties have cited and our independent research has disclosed no case, either in Pennsylvania or in any other Code jurisdiction which has decided this issue. Willier & Hart, Uniform Commercial Code Reporter-Digest (1965). However, the Code itself contains a rule which compels a contrary result. UCC § 1–103 states that "[u]nless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to * * * fraud [and] misrepresentation * * * shall supplement its provisions." See In the Matter of Kravitz, 278 F.2d 820, 822 (3 Cir. 1960). Thus, it is clear that the Pennsylvania exceptions would apply and testimony of prior oral agreements would be admissible.

■ Since the parol evidence rule, under the circumstances here, does not apply, and, as we later demonstrate, the counterclaim was improperly dismissed, we think the entry of summary judgment on the principal claim was untimely. Under the guidelines established by Rule 56(d), the district court can properly determine which issues involve disputed facts and those which do not. After issuing an appropriate order, it may proceed to trial on the issues involving factual disputes. See 6 Moore's Federal

---

5. Williston states that the parol evidence rule defines the limits of a contract. 4 Williston, Contracts (3d ed.) § 631 at 955.

6. Because we make this determination at the outset, we are not required to decide the more difficult question of whether conduct consistent with a writing which is a final expression by one of the parties amounts to an adoption of that writing as a final expression of their agreement under the Code. See Restatement, Contracts § 228, Illustration 2.

Practice ¶ 56.20[1] et seq. We believe that the district court properly found that there were no genuine issues of material fact relating to the complaint or the defense that no contract existed. An examination of the pleadings, the interrogatories, answers thereto, exhibits and record of the hearing on the motion for summary judgment discloses the following undisputed facts: (1) that for a period of more than two years, the parties engaged in the sale and purchase of goods from each other; (2) that the price of the goods sold was computed on a catalogue-less-11% basis; (3) that the sales commenced shortly after defendant was in receipt of a written confirmatory offer from the plaintiff (letter of February 9); (4) that the parties have engaged in a course of dealing substantially consistent with the terms of the confirmed offer in that the large orders contemplated were made aggregating over $800,000 during a two-year period, that defendant was required to pay freight charges indicating that the shipments were made F.O.B. Pittsburgh, that the price paid was dealer catalogue less 11%, that the officers of plaintiff visited the defendant's store frequently and made available some merchandising services, that an initial order was made and paid less the preferential 11% discount, and finally, that Irving Molever considered himself personally bound on Big Wheel's obligations; (5) that several of defendant's counterclaims may readily be founded on the letter of February 9; (6) that the goods sold to the defendant between March and June, 1964, were received and accepted; (7) that the defendant has sold most of the goods delivered during that time period; (8) that the prices for the goods accepted and received between March and June, 1964, were computed in a manner similar to all previous sales; (9) that the defendant has not paid for the goods received and accepted between March and June, 1964; (10) that defendant was aware as early as August, 1962, that the prices it was paying were higher than they would have been if computed on a cost-plus basis;

and (11) that although the defendant had objected to the computation of prices, it continued to purchase large quantities of goods from the plaintiff and continued to pay prices computed on that basis.

The enumerated facts above and the absence of any other disputed facts, when considered in light of the weight the Code attaches to a course of dealing, UCC § 2–208(1), and its liberal policy regarding formation of contracts of sale, UCC § 2–204(1), support the conclusion that a contract existed on the terms alleged in the complaint. Needless to say, this conclusion also disposes of the allegation by the defendant that no contract existed.

■■■ Although we agree that there were no genuine issues of material fact as to the contract, we are just as certain that the district court committed error in granting summary judgment on the issue of fraud, as raised in both the answer and counterclaim, and on the remaining counterclaims. At the outset, it should be pointed out that fraud, as alleged here, is not truly a defense which will defeat the theory of recovery on which the plaintiff has sued, but rather, is in the nature of a counterclaim or setoff. This is so because the fraud alleged here is fraud in the inducement. It does not render the transaction void, but only voidable. Traditionally, a person so defrauded has recourse against the fraudulent party through either of two courses of action. He may rescind the transaction—tendering back what he has received and suing for what he has parted with—or he may affirm the transaction and maintain an action in deceit. McCormick, Damages § 121. "An action in trespass for deceit to recover damages for material misrepresentations inducing the making of a contract is founded on fraud or moral wrong, and is not based on the contract." 16 P.L.E. Fraud § 21 at 410. The Code, although also making damages available in an action for rescission, UCC § 2–721, does not otherwise change the traditional theory of election of remedies. In this case rescission is out of the question since the defendant

has admitted that it has sold the goods. Thus, fraud, as alleged here, is an independent action, the recovery for which may be set off against or may even exceed the amounts due and owing under the contract. See Sixsmith v. Martsolf, 413 Pa. 150, 196 A.2d 662 (1964).

The error of the district court may be pinpointed from its refusal to consider the allegations of fraud "as anything more than normal commercial 'puffing' which could not have misled an astute trader such as defendant's negotiator, Mr. Molever." This statement is irreconcilable with the accepted principle that

> "* * * In ruling on the motion [for summary judgment in an action based on a complex scheme of fraud], the court should remember that the movant has the burden of demonstrating clearly the absence of any genuine issue of material fact, that the court should not draw factual inferences in favor of the moving party, and should not resolve a genuine issue of credibility." 6 Moore's Federal Practice ¶ 56.17 [27] at 2215–2216.

This is the accepted rule in this circuit. Sarnoff v. Ciaglia, 165 F.2d 167 (C.A.3, 1947); see also United States v. Gill, 156 F.Supp. 955 (W.D.Pa., 1957). This principle is particularly apt where intent is a substantive element of the cause of action because intent is generally to be inferred from the facts and conduct of the parties.

With all deference to the district court, the result reached would not appear to be so palpably incorrect had it reasoned that reliance on the representations (even if proved) was lacking as a matter of law. Had the allegations and the record supporting them been confined solely to the question of fraud prior to the initial sale, the discovery as early as August, 1962, that dealer catalogue less 11% was not equal to cost plus 10%, may have negated the element of reliance as a matter of law. See Restatement Second, Torts §§ 541, 541A, 542 (Tent.Draft No. 10, 1964). However, the other representations that appear on the record and the suspension of discovery prevent this court from making any such adjudication. These matters and doubtless other complex issues of fact (which may appear on the completion of discovery) and credibility will undoubtedly require resolution by the trier of fact. Similar fact issues are presented by the remaining counterclaims.

Thus far we have dealt only with the appeal from the entry of summary judgment. The denial of the motion to amend and for reconsideration of the order granting summary judgment[7] requires but brief comment. Because the order sought to be reconsidered is herein vacated, we need only reiterate what was said by the Supreme Court in Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962): "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."

The orders of the district court will be vacated and the cause remanded for disposition not inconsistent with this opinion.

---

7. The timeliness of filing of the motion for reconsideration was neither raised nor argued. Whether such a motion should be treated as pursuant to Rule 59(e) or under Rule 60(b) appears to have been settled in this circuit. Sleek v. J. C. Penney Co., 292 F.2d 256 (C.A.3, 1961). The Supreme Court has yet to rule on the issue, see Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227 (1962).