GIRARD TRUST BANK v. HENDERSON BELK, FRANK W. WILSON, PALMER FORD AND HENDERSON BELK ENTERPRISES, INC.

No. 7826SC621

(Filed 5 June 1979)

1. **Fraud § 12— credibility of defendant—fraudulent intent—issues of fact—summary judgment improper**

In an action to recover damages suffered by plaintiff because of defendants' allegedly fraudulent scheme to secure money from plaintiff and others, the trial court erred in entering summary judgment for defendants Henderson Belk and Henderson Belk Enterprises since the materials offered in support of and in opposition to the summary judgment motion presented a material issue of fact with respect to defendant Henderson Belk's credibility, and since summary judgment is generally inappropriate where fraudulent intent must be proved, as intent is a state of mind generally within the exclusive knowledge of the party accused and, by necessity, must be proved by circumstantial evidence.

2. **Fraud § 9— specific allegations in complaint—sufficiency**

Plaintiff's complaint contained abundant allegations of specific facts along with general allegations of defendants' state of mind sufficient to state a cause of action for fraud. G.S. 1A-1, Rule 9(b).

3. **Judgments §§ 36.2, 37.3— collateral estoppel—issues not same—res judicata—parties not same**

There was no merit to defendants' contention that adjudication of this cause of action for fraud was precluded by the dismissal of a related action in the U. S. District Court, since the doctrine of collateral estoppel was inapplicable, as the earlier dismissal for failure to prosecute did not purport to determine the existence or non-existence of fraud, and since *res judicata* was not applicable to preclude the action, as the parties were not the same in the earlier action as in the present action.

APPEAL by plaintiff from *Johnson (Clifton), Judge.* Judgment entered 16 February 1978 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 28 March 1979.

This action was instituted by Girard Trust Bank alleging that defendants participated in a scheme to secure money from the plaintiff and others by false and fraudulent means. Plaintiff prayed for actual damages of $80,000, punitive damages of $100,000, attorneys fees, and for civil arrest of the defendants. Defendants moved for dismissal of the complaint and for summary judgment. The motion to dismiss was denied by Judge Harry Martin 8 October 1976. Subsequently, summary judgment was entered on behalf of defendants Henderson Belk and Henderson Belk Enterprises, Inc., by Judge Clifton Johnson 16 February 1978.

Contents of the pleadings, affidavits, depositions, and interrogatories are summarized: Defendant Henderson Belk was, during the year 1973 when the alleged fraudulent transactions transpired, President of Automated Disposal Systems, Inc. (Automated) and owned 7,750 of the ten thousand shares in that corporation. During 1973, Belk also owned all of the shares of Henderson Belk Enterprises, Inc. (Enterprises), Automated's managing service. Defendant Palmer Ford was a vice-president and director of Automated. He arranged Belk's purchase of Automated stock. Ford's whereabouts are unknown. He has not communicated with Belk in at least two years. Defendant Frank W. Wilson was a vice-president and a director of Automated during the period in question. Furthermore, Wilson served as vice-president of 19 separate corporations controlled by Belk and managed the daily operations of Automated. Wilson's salary was paid by Enterprises, which functioned as a management service serving the various corporations controlled by Belk. The record indicates, however, that Automated did not compensate Enterprises for the services of Wilson. Sue C. Norman was employed, for a time by Automated and later by Enterprises, as secretary and receptionist for Enterprises and at the same time as bookkeeper for Automated. She prepared the inventory control and was authorized to sign checks for Automated. Automated's corporate offices were located in the offices of Enterprises. Enterprises' assets consisted of office furniture and a vehicle. The offices are now located in the Executive Building, 623 East Trade Street, Charlotte. During 1972 and 1973, the offices were located in Belk's Barringer Hotel at 426 North Tryon Street.

Wilson went to work as an accountant for Belk in 1970. His primary responsibility with Automated was to "wind down" the

business and dispose of its inventory. Between December of 1970 and December of 1972, Automated sold only two Disposacons. Automated was at this time licensed to manufacture, sell, and service an automated waste disposal system known as a Disposacon. The system was designed to burn large quantities of waste materials without the release of smoke and ash into the atmosphere. The Disposacons were manufactured for Automated by Fabricated Metals of San Leandro, California, and Leavesley Industries, Jacksonville, Texas. When purchased, the units were shipped directly from the manufacturer to the purchaser. In December of 1972 and January of 1973, there were apparently 14 Disposacons in existence—two installed as demonstrators in Charlotte (at businesses controlled by Henderson Belk), three completely assembled units at the Fabricated Metals plant, and nine units at Leavesley Industries in various stages of assembly. In December of 1972, approximately one-half of the units had been paid for by money advanced to Automated by Henderson Belk. Belk personally guaranteed to Leavesley Industries payment of up to $100,000 for the balance of the cost to manufacture the nine units it was assembling.

W. David Temel, acting for Temel-Peck Enterprises, in November of 1972 entered into the agreement with Frank Wilson, acting for Automated, which eventually gave rise to this and other lawsuits. Temel agreed to purchase ten Disposacons at a price of $13,000 per unit. Wilson denies that he had any knowledge of Temel's financing arrangements prior to preparing the first invoice. The financing was arranged by Don Weiss, a financial broker whom Wilson had known since 1970 and who had assisted Wilson in seeking financing for Automated in September of 1972. Temel-Peck's financing was arranged through several leasing companies. The arrangement was a typical lease-financed transaction wherein the "purchaser", in this case Temel-Peck, contacted the leasing companies and promised to lease the equipment, here Disposacons, if the leasing company would purchase the equipment from the seller. The lease agreement included an option to purchase the equipment at the end of the lease term. Temel-Peck contacted Trotter Leasing Corporation, plaintiff's assignor, to arrange a lease of two Disposacons. Trotter agreed and sought its own purchase financing through the plaintiff Girard Trust Bank. Trotter assigned its leases to the bank as

security for the loan. The bank disbursed the proceeds of the loan to Automated in reliance upon the invoice price and the price indicated on the lease agreement.

Invoices for the sale of each unit were prepared for Automated by Sue Norman at Wilson's direction and according to Temel's specifications. The first invoice was prepared for a leasing arrangement with the Equilease Corporation. The invoice was prepared to indicate a purchase price of $31,500 when, in fact, the sales price was acknowledged as being $13,000. Wilson indicated that Temel assured him that Equilease approved of the excess purchase price indicated on the invoice which excess would, in effect, finance the installation and shipping costs of the unit. Equilease issued a check to Automated in the amount of $31,500. Wilson retained $13,000 and remitted the remainder to Temel-Peck. The record indicates similar transactions involving the remaining nine units. OPM Leasing Corporation sent Automated a check covering the invoice price of $40,647. Automated forwarded all of the proceeds of that check except the $13,000 purchase price. $80,000 was received in payment of two invoices from American Leasing Corporation. $40,000 was retained by Automated, $35,000 forwarded to Temel-Peck and $5,000 forwarded to Don Weiss at Temel's direction as a fee. Automated received $80,000 from Domler Leasing Corporation in payment of two invoices issued by Automated, $40,000 of which was paid to Temel-Peck and $40,000 of which was retained by Automated. Finally, Automated received two $40,000 checks from Funding Systems Leasing Corporation in payment of two invoices issued by Automated. One of the checks was retained, and one was endorsed over to Temel-Peck.

Turning our attention to the purchase financed by Girard Trust Bank, the record indicates that Temel had arranged for Trotter Leasing Corporation to purchase Disposacon unit numbers 007-SL and 012-SL, which he would in turn lease from Trotter. Wilson directed that each invoice should be prepared to indicate a sales price of $40,000 per unit. Unit 012-SL was shipped to Winston-Salem but refused by Temel because of rust damage. After it had been rejected, the unit was stored behind the Cavalier Inn (formerly Barringer Inn) until it was taken to Construction Associates, a Belk company, in December of 1974. Unit 007-SL, according to Wilson, was not available for shipment until

March or April 1973, and finally was shipped to Temel in November of 1973. The shipment was made subsequent to many inquiries by the various leasing companies concerning delivery of the machines, subsequent to Temel's letters in August of 1973 advising the leasing companies that he had not received the machines, and subsequent to the notice by Temel that Wilson should not send any more units. Automated received directly from Girard Trust Bank its check dated 23 March 1973 in payment for Unit 007-SL in the amount of $40,000. Wilson thereafter endorsed the check over to Temel-Peck Enterprises. The check was picked up by Temel himself at Wilson's office. The check dated 27 March 1973, from Girard Trust Bank to Automated in the amount of $40,000 in payment for Unit 012-SL was endorsed to Henderson Belk Enterprises. Wilson indicated that the money was used in partial payment of an indebtedness of $400,000 Automated allegedly owed to Henderson Belk Enterprises.

Of the ten units purportedly purchased from Automated, only two were actually received and accepted by Temel-Peck. The only other unit shipped by August of 1973 was the unit purchased by Trotter but refused by Temel-Peck. In August of 1973, Wilson by letter had assured officials of plaintiff bank that delivery of the two units was immediately forthcoming no later than 23 August 1973. That promise was not fulfilled. Wilson denies any misconduct and maintains that despite the appearance of impropriety, he somewhere has checks to Temel for all of the invoice amounts except $130,000 representing a purchase price of $13,000 for each of the ten Disposacons.

The record indicates that prior to the above described transaction, W. David Temel and Henderson Belk had been involved in numerous business arrangements to which Frank Wilson was privy. Temel contacted Belk in 1971 concerning the possible purchase of Belk's motel, the Eden Rock-Blair House in Durham. The purchase was completed in the early fall of 1971. Temel-Peck thereafter purchased Belk's High Point Motor Lodge, which transaction involved a $25,000 note executed in favor of Belk by Temel-Peck. Belk brought suit on that note 3 February 1972. Judgment was entered and satisfied in 1973. Also, in the fall of 1971, Temel-Peck leased from Belk the Cavalier Inn (formerly the Barringer Inn) in Charlotte. That lease was shortly thereafter terminated

when Temel-Peck was unable to make lease payments. The property was returned and Belk retained the improvements made by Temel-Peck in settlement of the breached lease agreement. Henderson Belk Enterprises maintained its offices in the Cavalier Inn during the period of the lease. The record also indicates that on 21 September 1971 Henderson Belk personally guaranteed the obligations of Temel-Peck Enterprises with Northwestern Bank in the amount of $104,043.60.

The record also indicates, as mentioned above, that Frank Wilson was acquainted with Don Weiss, Temel-Peck's financial broker, and sought his aid in the fall of 1972 to obtain financing for Automated. Weiss had suggested to Wilson that a sale-leaseback arrangement was a last resort method to finance its inventory. Wilson himself was familiar with such arrangements because of his experience working for an automobile leasing company. He recognized the lease as a more expensive form of financing than the traditional commercial financing. He knew from experience that the leasing companies traditionally await the receipt of a bill of sale or invoice before disbursing funds to cover the purchase of a leased item.

The record is inconclusive with respect to Henderson Belk's personal involvement in the "sale" of the ten Disposacons. Wilson indicated that Belk did not participate in the negotiation of the sale. He told Belk in November of 1972 that Temel-Peck had expressed interest in purchasing the Disposacons for $13,000 each and that Temel-Peck would arrange its own financing. Wilson testified that he never showed to Belk any invoices for the units and did not tell him about the inflated invoice prices. Wilson stated that he did not report to Belk the large amount of money received by Automated, but only reported that Temel was following through on the purchase. Wilson stated that only periodically would he prepare statements to Belk showing the receipts of Automated, such statements purportedly being made only for the purpose of informing Belk of the cost of maintaining Automated in an "inactive stage".

Belk maintains that he never discussed the sale of the Disposacons with Temel, although he had numerous other business dealings with him. His deposition indicates that he had

little to do with running Automated, but occasionally looked at the books. His testimony by deposition suggests that he was not even sure who was running the business at the time of the sale. He denies ever having seen or prepared any of the invoices. Belk furthermore indicated that he was not aware of any loans by Henderson Belk Enterprises to Automated. He contends that he had no knowledge of the nature of the transactions until the legal proceedings began, at which time he turned the matter over to his attorney.

The deposition of Sue Norman, a secretary for Henderson Belk Enterprises and the bookkeeper for Automated, indicates that the irregularity of the transaction with Temel-Peck was reported by her to Belk personally before July of 1973. Norman informed Belk that invoices were prepared to indicate sales prices far exceeding the true negotiated price. Norman quit her job in July of 1973 but returned because she understood that she was to keep Belk advised of Wilson's conduct. Between August and December she reported to Belk concerning the operation of Automated. Norman again resigned in December after learning that Belk had advised Wilson about her purpose for re-employment and her reports.

Norman also testified concerning conduct at the office. She recalled typing the numerous invoices at Wilson's direction showing the inflated purchase prices and the fact that some invoices were prepared for units already on lease with someone else. She recalls that Temel and Weiss were in the offices daily while the checks were being received for the purchase of the Disposacons. When certain payments were due, Weiss and Temel would repeatedly check by her office to ascertain whether the checks had been received. Furthermore, when calls would come from leasing companies to determine if the Disposacons had been installed, she would, at Wilson's direction, refuse to inform them of the fact that they had not been installed, although she had access to such information.

As late as 4 March 1977, Belk confirmed that Automated Disposal Systems, Inc., was still in existence, although its offices had moved to the Executive Office Building at 623 East Trade Street in Charlotte. However, at the time plaintiff filed its com-

plaint in January of 1976 both Trotter Leasing Corporation and Temel-Peck Enterprises, Inc., had ceased operation and were without assets.

Girard Trust Bank avers that in reliance upon representations of defendant Frank Wilson, it caused the two checks for $40,000 each to be drawn and delivered to Automated. Plaintiff further alleges that the transaction described above was a scheme to defraud plaintiff, and was perpetrated through the representations of Wilson, acting for and on behalf of Automated and its officers, that (1) the sales price of the Disposacons was $40,000, when in fact it was only $13,000 and (2) that the two Disposacons had been delivered and were installed, when in fact Temel advised Trotter Leasing Corporation by a letter dated 28 June 1973 that the units never had been delivered by Automated. Temel thereafter ceased lease payments. Plaintiff made demand upon Wilson on 3 August 1973 for the return of the funds obtained from Girard Trust Bank.

From entry of summary judgment dismissing defendants Henderson Belk and Henderson Belk Enterprises from this action, plaintiff appeals. Defendants cross-appeal assigning error to the denial of their motion to dismiss the complaint.

*Fairley, Hamrick, Monteith & Cobb, by S. Dean Hamrick and F. Lane Williamson, for plaintiff appellant.*

*Weinstein, Sturges, Odom, Bigger, Jonas and Campbell, by T. LaFontine Odom and L. Holmes Eleazer, Jr., for defendant appellees.*

MORRIS, Chief Judge.

### Plaintiff's Appeal

Plaintiff assigns error to the entry of summary judgment dismissing defendants Belk and Henderson Belk Enterprises, Inc. Plaintiff's primary contention is "that the circumstantial evidence that Belk was a party to the fraud is overwhelming." Furthermore, plaintiff cites Temel-Peck's indebtedness to Belk as a motive for the alleged scheme, Belk's control of the corporations

as the opportunity to perpetrate the fraud, along with the knowing acceptance of the benefits of the fraudulent transaction, failure to make an investigation of the transaction (acquiescence), and a "ratification" of the conduct as "strong indications that he knew the entire situation from its inception." Plaintiff's position, therefore, appears to be that not only do the inferences drawn from the materials submitted in opposition to the motion for summary judgment prove that Belk must have been involved in the alleged fraudulent scheme, but that his conduct of ratification and acceptance of the benefits establish his liability. *See generally* 37 C.J.S., Fraud § 61.

The elements of fraud long have been clearly enunciated by the courts in this State. In a recent decision determining that judgment on the pleadings was inappropriate in a fraud case because of the existence of material issues of fact, the Court noted:

"While fraud has no all-embracing definition and is better left undefined lest crafty men find a way of committing fraud which avoids the definition, the following essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy,* 286 N.C. 130, 138, 209 S.E. 2d 494, 500 (1974).

Summary judgment here was apparently entered because of the trial court's opinion that as a matter of law Belk was not responsible for the alleged fraud of his agent merely because of the legal relationship between Belk as an officer and director of the corporations which Wilson served. *See Knitting Mills Co. v. Earle,* 237 N.C. 97, 74 S.E. 2d 351 (1953). However, as noted above, plaintiff's allegations indicate more than just the agency relationship. Plaintiff's averments tie Belk to the alleged scheme through inferences that he must have been involved because of his relationship with all of the parties and his potential personal benefit from the transaction. Plaintiff relies upon inferences which it maintains should be drawn from the circumstantial evidence to establish the above-mentioned elements of fraud. The

effect of such inferences on the propriety of summary disposition of the case must be considered.

The threshold inquiry in reviewing the propriety of the entry of summary judgment concerns whether genuine issues of material fact are raised by the pleadings and papers filed in conjunction with the motion. The burden is upon the party moving for summary judgment to show, in order to be entitled to judgment, that no such questions of fact remain to be resolved. *Bank v. Gillespie*, 291 N.C. 303, 230 S.E. 2d 375 (1976). The movant's papers must be carefully scrutinized, while those of the opposing party are to be indulgently regarded. *Kidd v. Early*, 289 N.C. 343, 222 S.E. 2d 392 (1976); *Page v. Sloan*, 281 N.C. 697, 190 S.E. 2d 189 (1972). The defendant Belk's affidavit and deposition suggest that Belk was completely unaware of the nature of financing for purchase of the ten Disposacons, and that Belk at no time acted for Automated in any transaction or scheme as alleged by the plaintiff. As a matter of fact, Belk's testimony indicated that he knew absolutely nothing about Automated's business and could not testify about it without checking the records, including who ran the Company. An example:

"As to whether I had 7,750 shares of the 10,000 shares of outstanding stock and had the right to control it, I had a stock interest in it. As to whether I actually participated in the running of Automated it would be hard to answer that question. Occasionally, I did see the books. I don't think I ever wrote any checks on the company. I don't know exactly how to answer the question as to whether I ever saw any checks written on the company. As to whether I ever checked the company books I observed some of the reports. I just don't remember how often I observed the reports.

Frank Wilson probably had something to do with running Automated in 1972 and 1973. I don't think Mr. Wilson was the one that ran the company from the time he came to Charlotte until at least 1974. As to whether during the time Automated had been in Charlotte anyone other than Frank Wilson has been in charge of running the company, I'd have to check the records.

\*        \*        \*

While the company was in Charlotte it did sell some disposal machines. I'd have to check the records to tell where these machines were purchased. I did have dealings with Leavesley Industries, Incorporated. They made some of the products that ADS sold at one time. I'd have to check the records to see how this relationship began. I did talk to someone that represented the company. I don't remember the specific details, what sort of dealings I had with any representative of that company. I'd have to check to see if I brought a lawsuit suing them for a million dollars for something I claimed they did wrong to me. I'd have to check to see if I ever brought a lawsuit against Leavesley Industries, Incorporated. I think that a company probably that I had an interest in may have brought a lawsuit but I don't know exactly the way you word things how to answer them. That lawsuit is not still pending. I suppose the lawsuit you have reference to has been settled. You would have to check with my attorney to see if I just took a dismissal in that lawsuit.

ADS did make some purchases from Leavesley. They purchased some equipment. I don't know how you would describe it. It was for use in the operation of ADS's activities. I'd have to check the records to see just what they did buy. . . .

I did know a Mr. Temel. I don't exactly remember where I met him. I don't even remember when it was or what it was. I have met him. I wouldn't say I have met him on a number of occasions, no, more than one.

As to what sort of business dealings I or any of my companies had with Mr. Temel, can you be more specific? Some companies that I have had interest in have had some transactions with Mr. Temel. I'd have to check the records to see what companies. I understand that ADS was one of them.

As to how I understand it, I understand from lawsuits that were brought that it had some dealings with them. It is my testimony that I had no dealings with Mr. Temel insofar as many business relationship with ADS is concerned. It is absolutely correct that I never talked with Mr. Temel at all about any business dealings he had with ADS. I don't know for sure who represented ADS in these business dealings.

I understand Mr. Frank Wilson had some dealings with Mr. Temel. My understanding is that Mr. Wilson on behalf of ADS sold some machines to Mr. Temel's company. I believe it is correct, that is, Temel-Peck Enterprises."

On the other hand, plaintiff produced a significant volume of evidence intended to show that Belk must have been involved in the scheme or at least ratified the fraud because of his control of Automated and his relationship with the purchaser Temel-Peck. It is, therefore, apparent that defendant Belk relies heavily upon his own deposition testimony and affidavit to support his motion for summary judgment. Because of the importance of these papers, the credibility of Belk becomes a key issue in this matter, and where credibility is a key issue, summary judgment is seldom an appropriate procedure for resolution of the matter. *See generally* 10 Wright and Miller, Federal Practice and Procedure: Civil § 2726 (1973).

[1]   The issue of credibility presents an issue of fact which, if material, should be left to the trier of fact. Here, not only does the defendant Belk's testimony on deposition, when indulgently regarded in favor of plaintiff, appear inherently incredible, but inferences reasonably capable of being drawn from plaintiff's evidentiary material place doubt upon the credibility of defendant Belk's deposition testimony and affidavit. *Compare Kidd v. Early,* supra. We are of the opinion that reasonable inferences available from the plaintiff's materials and the issue of Belk's credibility present material questions of fact such as to prevent the entry of summary judgment.

In our opinion there is another basis for disapproving of the granting of summary judgment in the case. The existence of fraud necessarily involves a question concerning the existence of a fraudulent intent on the part of the party accused of such fraud. The intent of a party is a state of mind generally within the exclusive knowledge of that party and, by necessity, must be proved by circumstantial evidence. Summary judgment is generally inappropriate under such circumstances. *See generally* 10 Wright and Miller, Federal Practice and Procedure: Civil § 2730 (1973). This stance was taken by the United States Court of Appeals for the Third Circuit which concluded that summary judgment in favor of the movant in an action based upon a complex scheme of fraud

should not be utilized to draw factual inferences in favor of the moving party and to resolve genuine issues of credibility, particularly "where intent is a substantive element of the cause of action because intent is generally to be inferred from the facts and conduct of the parties." *Associated Hardware Supply Co. v. Big Wheel Distributing Company*, 355 F. 2d 114, 121 (3d Cir. 1966). *See also Teledyne Industries, Inc. v. Eon Corp.*, 373 F. Supp. 191 (S.D.N.Y. 1974). For the above reasons, we are of the opinion that the summary judgment in favor of defendants Henderson Belk and Henderson Belk Enterprises was improvidently granted.

## Defendants' Appeal

Defendants have brought forward two assignments of error on cross-appeal, both of which are directed to the trial court's denial of their motion for dismissal of the complaint under G.S. 1A-1, Rule 12(b)(6). The grounds for the assignment of error are twofold.

[2]   The defendants first contend that plaintiff's allegations fail to state a claim for relief for fraud. Their reliance is based primarily on G.S. 1A-1, Rule 9(b) which provides:

"(b) *Fraud, Duress, Mistake, Condition of the Mind.* — In all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

This rule is in contrast to the notice pleading approach adopted upon the enactment of G.S. 1A-1, Rule 8(a), and is essentially a codification of our former case law with respect to pleading fraud. *In re Estate of Loftin*, 21 N.C. App. 627, 205 S.E. 2d 574 (1974), *affirmed*, 285 N.C. 717, 208 S.E. 2d 670 (1974). The purpose of the prior case law and the present G.S. 1A-1, Rule 9(b), is to require pleading of the facts upon which the plaintiff relies to establish the essential elements of fraud. As this Court found in *In re Estate of Loftin*, the facts alleged must be sufficient to support a finding of:

"The intent to deceive [*Callaway v. Wyatt*, 246 N.C. 129, 97 S.E. 2d 881 (1957)]; the specific false representations that

were made [*Fulton v. Talbert*, 255 N.C. 183, 120 S.E. 2d 410 (1961)]; that the defrauded party relied upon the misrepresentations to his detriment [*Products Corporation v. Chestnutt*, 252 N.C. 269, 113 S.E. 2d 587 (1960)]." 21 N.C. App. at 631, 205 S.E. 2d at 576.

We note that there are abundant allegations of specific facts along with general allegations of defendants' state of mind sufficient to state a cause of action for fraud. The trial court's denial of defendants' motion to dismiss was proper on this ground.

[3] Defendants finally contend that the adjudication of this cause of action was precluded by the dismissal of a related action in the United States District Court for the Western District of North Carolina entitled "*Trotter Leasing Corporation v. Automated Disposal Systems, Inc., Temel-Peck Enterprises, Inc., a/k/a Temel-Peck Enterprises Co., W. David Temel, David F. Peck, Cornelia A. Temel, David F. Peck, Caroline A. Peck, Adolfas Akelatis and Annabelle Akelatis*". That action was dismissed under the Federal Rules of Civil Procedure, Rule 41(b), for failure to prosecute. Defendants contend that, because in both actions the issue of fraud is essentially the same, the defendants in each action are essentially the same, and the plaintiff in this action is in a position of "privity" with the plaintiff in the original action, Girard Trust Bank is collaterally estopped from re-litigating the fraud issue presented in the present suit.

We note initially that the principle of collateral estoppel does not apply to this case to preclude adjudication of the fraud issues. Collateral estoppel, a doctrine closely related to that of *res judicata*, precludes re-litigation only of issues necessarily determined in a prior adjudication between the same parties and those in privity to them. *King v. Grindstaff*, 284 N.C. 348, 200 S.E. 2d 799 (1973); *see generally* 1B Moore's Federal Practice ¶ 0.405[1] (2d ed. 1974). Assuming, *arguendo*, the other prerequisites for establishing collateral estoppel, the judgment dismissing the action for failure to prosecute did not purport to determine the existence or non-existence of fraud. We, therefore, consider whether the action initiated against defendants was precluded under the doctrine of *res judicata* as applied in its technical sense. *See Hartford Accident Indemnity Company v. Levitt & Sons, Inc.*, 24 F.R.D. 230 (E.D. Pa. 1959).

*Res judicata* operates to preclude a subsequent suit on the same cause of action between the same parties or their privies once final judgment has been entered in the initial action. *King v. Grindstaff, supra.* Plaintiff concedes that the dismissal of this action under Federal Rule 41(b) for failure to prosecute is a final judgment. *See Kotakis v. Elgin, Joliet & Eastern Railway Co.*, 520 F. 2d 570 (7th Cir. 1975); *see generally* 1B Moore's Federal Practice ¶ 0.409[1], n.n. 34 and 35 (2d ed. 1974). We must, therefore, determine whether the remaining requirements for establishing *res judicata* exist to preclude plaintiff's action. We take note of the general principle that the application of *res judicata* must be narrowly construed and cannot be left to "uncertain inference". *Gunter v. Winders*, 253 N.C. 782, 785, 117 S.E. 2d 787, 789 (1961).

A plea of *res judicata* is effective to preclude a subsequent action which is based on the same cause of action and between the same parties and privies. *See King v. Grindstaff, supra.* Plaintiff contends both that its suit is based on a different cause of action from the initial suit and that the parties to the suits are not the same. We agree that the parties are not the same and that, therefore, *res judicata* does not apply to preclude the action.

The concept of the identity of parties and their privies encompasses the requirement of mutuality of the estoppel by judgment.

"Thus, a party to the subsequent action, who was not a party to the former action and, therefore, is not estopped by the judgment therein, cannot assert that judgment as an estoppel against his opponent, even though the opponent was a party to the action in which the judgment was rendered." *Kayler v. Gallimore*, 269 N.C. 405, 407, 152 S.E. 2d 518, 520 (1967); *see generally* 1B Moore's Federal Practice ¶ 0.412[1] (2d ed. 1974).

We cannot say that defendants Henderson Belk and Henderson Belk Enterprises, Inc., would have been bound by a judgment in the prior case. First, it is obvious that Henderson Belk Enterprises, Inc., was not a party to the prior suit nor was it an agent, officer, director, or shareholder of the defendant Automated. We have been cited to no authority which would support a finding that Henderson Belk Enterprises, Inc., would be bound by a judg-

ment against Automated solely because of the existence of common ownership between the two corporations. This leaves us with the question whether Henderson Belk, personally, would have been bound by a judgment rendered in favor of the plaintiff in the initial action.

The allegations in the initial action alleged fraudulent representations by Automated, and, in contrast to the action *sub judice*, contained no allegations of involvement by the individual defendant Belk. In determining whether a judgment against a corporate entity binds one who controls the corporation, the late Justice Parker of our Supreme Court in *Lumber Co. v. Hunt*, 251 N.C. 624, 627, 112 S.E. 2d 132, 134-35 (1960), observed:

> "A corporation is an entity distinct from its shareholders, and the corporate entity is distinct, although all of its stock is owned by a single individual or corporation. 13 Am. Jur., Corporations, Sec. 6. To the same effect N.C.G.S. 55-3.1. F. L. Taylor has only a contingent derivative right of succession of property interest, with the other stockholders, from the Troy Lumber Company so far as the present suit for damages is concerned. The admission that F. L. Taylor is the controlling stockholder of Troy Lumber Company, is chairman of its board of directors, its President, and has complete charge of its operations and business, is insufficient to establish the identity or privity between him and the corporation for the purpose of *res judicata*."

The prior action initiated by Trotter Leasing Corporation alleged no fraudulent conduct on the part of Belk individually; and, in the absence of allegations and proof of actual fraudulent conduct by a corporate shareholder, officer, or director, or ratification and adoption of such conduct, an officer, director, or stockholder generally may not be held liable for the acts of the corporation. *Cf. Henderson v. Finance Co.*, 273 N.C. 253, 160 S.E. 2d 39 (1968); *see generally* 19 C.J.S., Corporations § 850; 19 Am. Jur. 2d, Corporations § 1384.

The denial of defendants' motion to dismiss the complaint is affirmed, and the entry of summary judgment in favor of defendants is reversed.

Affirmed in part; reversed in part.

Judges CLARK and ARNOLD concur.