Richard Franklin MILLER, et
al., Plaintiffs,

v.

Dale CARSON, etc., et al., Defendants.

T. Edward Austin, Amicus Curiae.

No. 74–382–Civ–J–S.

United States District Court,
M. D. Florida,
Jacksonville Division.

June 18, 1981.

William J. Sheppard, Jacksonville, Fla.,
for plaintiffs.

James A. Peters, Tallahassee, for defendant State of Fla.

Donna H. Stinson, Tallahassee, for defendant HRS.

Robert G. Alexander, Jacksonville, for defendant City of Jacksonville, Sheriff.

Lawrence C. Pritchard, Jacksonville,
Amicus Curiae.

CHARLES R. SCOTT, District Judge.

## OPINION

The Court is faced with the question of whether it has the power, i. e., jurisdiction, to resolve a question of state law arising from a provision of the permanent injunction entered in this cause July 17, 1975, 401 F.Supp. 835, and, assuming the Court has the power, whether it should exercise that power.

On March 17, 1981, the so-called "City Defendants" filed a notice of violation and motion for order to show cause directed against Alvin J. Taylor, Secretary, Florida Department of Health and Rehabilitative Services (HRS), claiming Taylor is in violation of the terms of the Court's permanent injunction entered July 17, 1975. Specifically, the City Defendants contend Taylor is in violation of Section VI, paragraph 6 which provides:

Any inmate requiring hospitalization due to a potentially infectious or contagious disease, mental illness, or any other ailment requiring hospitalization, shall not be housed in the Duval County Jail, Jacksonville Correctional Institution or Fairfield House. Any inmate of the Duval County Jail, Jacksonville Correctional Institution or Fairfield House who is adjudicated incompetent shall be transferred to an institution capable of providing appropriate care within 48 hours of the entry of the state court order.

The alleged violation lies in the fact that HRS has refused to take custody of inmates

of the Duval County Jail (DCJ) within 48 hours after such inmates have been declared mentally incompetent. As a result, the City Defendants have been forced to assume the financial burden of housing mentally incompetent inmates at University Hospital while awaiting word from HRS that a bed has become available at a state institution. This waiting period has averaged 16.11 days per inmate for the years 1977 through 1980. City Defendants have projected that the combined costs of transporting, housing and providing security for mentally incompetent inmates will approach $540,000 for 1981.

On April 3, 1981, the Court ordered Taylor, in his capacity as Secretary of HRS, to show cause within 20 days why he should not be held in contempt. The response filed on behalf of Taylor and HRS recounted the history of their limited involvement in this action.

On November 8, 1974, the Court entered partial summary judgment against former HRS Secretary O. J. Keller, directing him to promulgate certain rules prescribing jail standards as required by Fla.Stat. 951.23 (1973). On October 28, 1975, following the submission of proposed rules to the Court and the filing of objections to the proposed rules by plaintiffs, the Court found Secretary Keller's response to be inadequate under Florida law. That order was appealed to the Fifth Circuit Court of Appeals which affirmed this Court's exercise of pendent jurisdiction of the state law claims, while certifying to the Florida Supreme Court the question of whether a particular proposed rule complied with Florida statutory requirements.[1]

Aside from the partial summary judgment entered against the Secretary, the Court's permanent injunction of July 17, 1975, directed the Secretary to:

... take immediate steps as are necessary to investigate and determine the reasons for delay in transfer of mentally committed inmates from the time of commitment by the Florida state courts in Duval County to Florida state mental hospitals. Within 30 days from the date hereof, a report shall be submitted to this Court by defendant Keller stating the results of said investigation.[2]

Section VI, paragraph 9.

Thus, although Taylor correctly points out that he and HRS have been spared from the direct day-to-day application of the Court's permanent injunction, it is undisputed that the Secretary of HRS has been a party defendant in this cause since its inception and continues in that capacity at present.

On June 2, 1981, a hearing was held on the Court's order to show cause directed against Taylor. The Court limited the scope of the hearing to the narrow issue of whether the Court has the power to exercise pendent jurisdiction over the City Defendants' claim against HRS and, if that power is found to exist, whether the Court should exercise the power. The parties were directed to submit memoranda of law on the issue, which has been done.

■ Although the Court framed the issue as presenting a question of "pendent jurisdiction", it is perhaps more precisely described as a matter involving "ancillary jurisdiction." Both doctrines permit a federal court to adjudicate claims that do not independently meet federal jurisdiction requirements. The distinction is that, *inter alia*, pendent claims are asserted by plaintiffs in their complaint, whereas ancillary claims are asserted after the original complaint is filed, generally by one other than the plaintiff. *Corporation Venezolana de Fomento v. Vingero Sales*, 477 F.Supp. 615, 622 n.13 (S.D.N.Y.1979); *see Aldinger v. Howard*

---

1. Pending the appeal, the Court, upon consent of plaintiffs and the State Defendants, entered an order substituting Louie L. Wainwright, Director, Florida Division of Corrections, for the Secretary of HRS with regard to the October 28, 1975 order requiring resubmission of proposed rules. The Secretary, however, was not dismissed as a party defendant.

2. The report was apparently filed within the prescribed time period, although it was discovered by counsel for HRS in a later volume along with documents dated February 7, 1975.

*and Pendent Jurisdiction,* 77 Colum.L.Rev. 127, 128 n. 5 (1977). The instant claim is in the nature of a cross-claim, inasmuch as it was asserted by one group of defendants against another defendant. Federal jurisdiction over cross-claims which do not stand on their own federal jurisdictional footing is ancillary in character. *Scott v. Fancher,* 369 F.2d 842 (5th Cir. 1966); *Kelly v. Page,* 355 F.2d 114 (1964); *Childress v. Cook,* 245 F.2d 798 (5th Cir. 1957); *see generally* 6 C. Wright & A. Miller, Fed. Prac & Procedure § 1433 (1975).

It is unnecessary to become overly concerned with categorizing the issue before the Court as one involving either "pendent" or "ancillary" jurisdiction. The respective doctrines, although founded upon distinct lines of reasoning, have tended to blend together in recent times, forming somewhat of a symbiotic relationship in which the ancillary jurisdiction cases draw legal support from the pendent jurisdiction cases and vice versa.

Until 1926, ancillary jurisdiction was a doctrine of limited utility. It was applied to situations where it was deemed necessary to extend federal jurisdiction to parties not otherwise properly before the court, but who had a direct relation to property or assets which were properly before the court, in order to protect the interests of those parties in the property or to effectuate the judgment of the court. *Fulton Bank v. Hosier,* 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609 (1925).

In *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926), the Supreme Court greatly expanded ancillary jurisdiction. Plaintiff had brought an action in federal court alleging violations of the Sherman Act. Defendant asserted a counterclaim which, although it did not present a federal question, arose out of the same transaction as plaintiff's claim. Following dismissal of the federal claim, the Supreme Court, without citing any cases, determined that it was proper to hear the counterclaim on the merits. The Court,

relying upon a transactional analysis, determined that the "logical relationship" of the main claim and counterclaim justified the exercise of ancillary federal jurisdiction over the non-federal claim. 270 U.S. at 610,[3] 46 S.Ct. at 371.

The transactional analysis test provided the basis for the decision in *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1976), the leading case on pendent jurisdiction. In *Gibbs,* the Supreme Court established a two-step test to be employed by federal courts in considering whether to hear pendent claims involving state law. First, the court is to determine whether it possesses the *power* to hear the state claims. Second, assuming the court determines it does have the power, it must proceed to consider whether, as a purely discretionary matter, it should exercise that power. Transactional analysis controls the initial decision as to whether the court has the power to hear the pendent claim. In this regard, the court must conclude that: (1) the pendent claim arises from a common nucleus of operative facts; and (2) that the claims are such that a plaintiff would ordinarily be expected to try them all in one proceeding. 383 U.S. at 725, 86 S.Ct. at 1138.

That the historical distinctions between pendent and ancillary jurisdiction, although not extinct, have lost their significance was made apparent in *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). *Aldinger* called *Moore* "the decisional bridge" between the previously distinct doctrines of pendent and ancillary jurisdiction. *Aldinger* was a "pendent party" case in which the court stopped just short of endorsing petitioner's suggestion that since *Moore* adopted a transactional test quite similar to the test set out in *Gibbs,* there is no longer any "principled" distinction between the doctrines of ancillary and pendent jurisdiction. *Id.*

Given the complexities of the many manifestations of federal jurisdiction, together with the countless factual permutations

**3.** *Moore* has been characterized as an "ancillary" case, although that term was never used

in the opinion. *Aldinger v. Howard,* 427 U.S. 1, 12, 96 S.Ct. 2413, 2419, 49 L.Ed.2d 276 (1976).

possible under the Federal Rules, there is little profit in attempting to decide, for example, whether there are any 'principled' differences between pendent and ancillary jurisdiction; or, if there are, what effect Gibbs had on such differences. Since it is upon Gibbs' language that the lower federal courts have relied in extending the kind of pendent-party jurisdiction urged by petitioner here, we think the better approach is to determine what Gibbs did and did not decide, and to identify what we deem are important differences between the jurisdiction sustained in Gibbs and that asserted here.

*Id.* at 13, 96 S.Ct. at 2419.

The court appeared to be hinting that the lower federal courts have misbranded the problem of "pendent parties" as presenting questions of pendent rather than ancillary jurisdiction. The court, however proceeded to employ a *Gibbs*-type analysis, apparently untroubled by any possible mischaracterization. It could well be that the court was satisfied that the analysis would be substantially the same *regardless of which doctrine was relied upon* inasmuch as the transactional test controls the application of either pendent or ancillary jurisdiction.

We are not faced with a "pendent party" problem in the instant case. It is clear that the Secretary of HRS has always been and continues to be a proper party defendant in this cause. Rather, *Aldinger* is important because it serves to underscore the diminished significance of the historical distinctions between pendent and ancillary jurisdiction. While it would perhaps be fallacious to characterize the doctrines as the twin sons of different mothers, it is clear that they have long since ceased to be mere jurisprudential acquaintances.

The instant factual and procedural framework presents one of those "countless factual permutations" alluded to in *Aldinger.* Upon reflection, the Court is convinced that the issue before it is, in a technical sense, properly characterized as raising a question of ancillary jurisdiction rather than pendent jurisdiction. This is because the claim of the City Defendants is in the nature of a cross-claim. Nevertheless, regardless of which doctrine is employed, the result would be the same. This Court believes it has jurisdiction over the state law claim raised by the City Defendants, and it will exercise that jurisdiction.

The substantive state law question the Court is called upon to decide involves the relative responsibility of the City Defendants and HRS owed to inmates of the DCJ who have been declared mentally incompetent. The Court determined years ago that the DCJ lacked adequate facilities and personnel to care for mentally incompetent inmates and, for that reason, ordered that such inmates were not to be housed there. The permanent injunction, as modified by order entered January 12, 1981, commands that mental incompetents be "transferred to an institution capable of providing appropriate care within 48 hours of the entry of the state court order adjudicating the inmate to be presently incompetent." Section VI, paragraph 6. The order does not specify precisely where the inmates are to be transferred to or who is to bear the burden of transferring and supporting them. It is clear, however, that the burden rests upon either the City Defendants or HRS, both of whom are proper parties to this cause. The resolution of the substantive question necessarily requires an interpretation and application of state statutes and state circuit court orders.

## STEP I: POWER

■ This Court has the power to hear and resolve the state law claim raised by the City Defendants against HRS. The City Defendants and HRS have been parties to this cause since its commencement in 1974. Consequently, there is no question that the Court has jurisdiction over the parties. As to the question of subject matter jurisdiction, the Court is guided by *Revere Copper & Brass Inc. v. Aetna Cas. & Surety Co.,* 426 F.2d 709 (5th Cir. 1970). In *Revere,* the Fifth Circuit analyzed ancillary jurisdiction within the context of a counterclaim which lacked an independent basis for federal jurisdiction. The panel elaborated

upon the "logical relationship" analysis set forth in *Moore, supra,* and established a two-part test for determining whether ancillary jurisdiction exists in a particular situation:

> It would be fair to say, therefore, that a claim is ancillary when it bears a logical relationship to the aggregate core of operative facts which constitutes the main claim over which the court has an independent basis of federal jurisdiction.

*Id.* at 714.

> From the application of the doctrine of ancillary jurisdiction to these joinder devices, it appears that a claim has a logical relationship to the original claim if it *arises* out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.

*Id.* at 715.

There is no question that the claim of the City Defendants meets this test. As the two-part test is framed in the disjunctive, the Court finds it unnecessary to proceed further than the first step, although the Court is of the opinion that the state claim at issue meets both portions of the test.

The claim of the City Defendants arises out of the same aggregate of operative facts that serves as the basis of both claims, i. e., the claim of plaintiffs and the claim of the City Defendants against HRS. As a result of the filing by plaintiffs of a notice of violation claiming the City Defendants were housing mentally incompetent inmates at the DCJ in violation of the permanent injunction, the Court entered an order December 22, 1980, holding the City Defendants in contempt. Following a request for clarification of the permanent injunction on behalf of the City Defendants, the Court entered its January 12, 1981 order which amended Section VI, paragraph 6 of the permanent injunction by adding the 48 hour limitation. It is clear that all claims perti-

nent to the instant discussion arose from Section VI, paragraph 6 of the Court's permanent injunction. Thus, the claim against HRS satisfies the first portion of the test set forth in *Revere.*

Application of the *Gibbs* pendent jurisdiction test would not alter the result. The respective tests in considering the application of either pendent or ancillary jurisdiction, as already discussed, are substantially similar. They both focus on the transactional aspects of the claim. The Fifth Circuit Court of Appeals, applying the *Gibbs* test, has already affirmed on one occasion the exercise of "pendent" jurisdiction over state law claims raised in this cause. *Miller v. Carson,* 563 F.2d 757 (5th Cir. 1977).

Further support for the power of this Court to exercise ancillary jurisdiction over the state law claim is found in the line of cases upholding the power of a court to enforce and give meaning to its judgments or permanent injunctions. *See, e. g., United States v. Hall,* 472 F.2d 261, 265 (5th Cir. 1972); *Ohio Hoist Mfg. Co. v. LiRocchi,* 490 F.2d 105 (6th Cir.), *cert. denied,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Alsager v. District Court of Polk County, Iowa,* 447 F.Supp. 572 (D.C.Iowa 1977); *American Safety Table Co. v. Schreiber & Goldberg, Inc.,* 320 F.Supp. 603 (D.C.N.Y. 1970).

## STEP II: DISCRETION

Once it has been determined that the Court has power to exercise jurisdiction over the state claim, the next question is whether it will exercise that power. In considering this second question, the Court is guided by a sound, time-tested, yet too frequently ignored philosophy—the common sense approach. As this Court stated in *Florida Medical Ass'n v. Department of Health, Education & Welfare,* 454 F.Supp. 326, 329 (M.D.Fla.1978), "Ancillary jurisdiction, in short, is the 'common sense solution' to how a court of limited subject matter jurisdiction can achieve a complete, final and just disposition in a case over which it has acquired subject matter jurisdiction originally." The "jail case" has been before

this court on numerous occasions spanning a period of some seven years. The 18 volumes of court files and 28 pages of docket sheets containing several hundred entries attest to the substantial, continuous involvement of this Court in matters pertaining to the operation of the DCJ. Throughout the course of this litigation, the Court has been called upon to make many difficult decisions. Unpopular as some of these decisions have been, the Court has never shrunk away from its duty to fairly and objectively weigh and apply the law to the multitude of diverse factual situations that have arisen in this cause. On occasion, it has been necessary to render decisions interpreting state law. This is one of those occasions.

It is generally preferable to avoid involvement in matters presenting questions of state law. Avoidance, however, would be impracticable and undesirable under the present circumstances. A superficial glance leaves one with the impression that the instant controversy, arising between a local governmental unit and a state agency, should be left in the hands of a state court. A more penetrating observation would detect the intricate entanglement between the City Defendant's claim against HRS and seven years of litigation to which the City Defendants and HRS have always been parties. The City Defendants' claim against HRS did not arise in a vacuum. It was forged against a background of parries and thrusts culminating in the Court's order of January 12, 1981, setting a 48 hour time period within which to remove mental incompetents from the DCJ. Abandoning the tunnel-vision perspective, it becomes apparent that, for all practical purposes, the claim of the City Defendants is truly a part of the jail case.

In *United Mine Workers v. Gibbs, supra,* the Supreme Court set forth certain factors to be considered in the exercise of discretionary jurisdiction. These include "considerations of judicial economy, convenience and fairness to litigants." 383 U.S. at 726, 86 S.Ct. at 1139. These factors militate in favor of the Court exercising jurisdiction in the instant case. A refusal to exercise jurisdiction would force the City Defendants to abandon the Court which has served as the forum for all claims raised in this action and pursue an independent action in state court. This would undoubtedly result in some duplicity of pleadings and testimony. Moreover, the state court would be unfamiliar with the setting from which the action arose. As a corollary to this, the state court would necessarily have to interpret this Court's permanent injunction and subsequent orders. This point highlights a critical factor in the Court's determination. The substantive question to be resolved, although raising questions of state law, involves interpretation of the Court's permanent injunction and how it applies to the parties before it.

Accordingly, based upon the analysis set forth above, the Court concludes that it has jurisdiction to hear on the merits the claim of the City Defendants against HRS and, further, that it will exercise such jurisdiction. A hearing will be set.

It will be so ordered.