Richard Franklin MILLER, et al., Plaintiffs,

v.

Dale CARSON, etc., et al., Defendants.

T. Edward Austin, Amicus Curiae.

No. 74–382–Civ–J–S.

United States District Court,
M. D. Florida,
Ocala Division.

Oct. 28, 1981.

Robert G. Alexander, Asst. Gen. Counsel, City of Jacksonville, Jacksonville, Fla., for city defendants and sheriff.

Paul C. Doyle, Dist. Counsel, Jacksonville, Fla., Donna H. Stinson, Gen. Counsel, Dept. of Health & Rehabilitative Services, Tallahassee, Fla., for HRS.

William J. Sheppard, Jacksonville, Fla., for plaintiffs.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This matter is before the Court for consideration of what is, in essence, a cross-claim brought on behalf of the City Defendants against defendant Alvin J. Taylor, in his capacity as Secretary, Florida Department of Health and Rehabilitative Services (hereinafter 'HRS'). The question the Court has been called upon to resolve is relatively simple: who, under Florida law, bears the responsibility of caring for and keeping custody of state prisoners who have been declared mentally incompetent to

stand trial?[1] It has already been determined that the Court has ancillary jurisdiction of the City Defendants' claim and that the Court will exercise that jurisdiction. *See Miller v. Carson*, 515 F.Supp. 1375 (M.D. Fla.1981).

█ On March 17, 1981, the City Defendants filed a notice of violation and motion for order to show cause directed against HRS, claiming HRS was in violation of the terms of the Court's permanent injunction entered July 17, 1975, governing conditions of confinement at the Duval County Jail ('DCJ'). Specifically, the City Defendants pointed to Section VI, paragraph 6 of the injunction which provides:

> Any inmate requiring hospitalization due to a potentially infectious or contagious disease, mental illness, or any other ailment requiring hospitalization, shall not be housed in the Duval County Jail, Jacksonville Correctional Institution or Fairfield House. Any inmate of the Duval County Jail, Jacksonville Correctional Institution or Fairfield House who is adjudicated incompetent shall be transferred to an institution capable of providing appropriate care within 48 hours of the entry of the state court order.

The alleged violation lies in the fact that HRS has refused to take custody of inmates of the DCJ within 48 hours after such inmates have been declared mentally incompetent. As a result, the City Defendants have been forced to assume the financial burden of housing mentally incompetent inmates at University Hospital in Jacksonville while awaiting word from HRS that a bed has become available at a state institution. Representatives of HRS, at an evidentiary hearing held June 29 and 30, 1981, testified that the sole reason for the delay on behalf of HRS in accepting custody of mental incompetents is a lack of adequate bed space.

From 1977 through 1980, the average waiting period from the time an inmate has been declared mentally incompetent until he is transferred to the custody of HRS has been 16.11 days. City Defendants have projected that the combined costs of transporting, housing and providing security for mentally incompetent inmates will approach $540,000 for 1981.

On April 3, 1981, the Court ordered Taylor, in his capacity as Secretary of HRS, to show cause within 20 days why he should not be held in contempt for violating the Court's permanent injunction. At the show cause hearing, held June 2, 1981, the Court expressed concern as to whether it was the proper forum to consider the City Defendants' claim against HRS, inasmuch as the claim focuses essentially upon questions of state law. In an opinion entered June 18, 1981, the Court determined that it had ancillary jurisdiction over the state law claim and that it was appropriate for the Court to exercise that jurisdiction. *Miller v. Carson*, 515 F.Supp. 1375 (M.D.Fla.1981).

On June 29 and 30, 1981, an evidentiary hearing was held at which each side presented live witnesses and documentary evidence supporting their respective positions. There has never been any question that, pursuant to the terms of the Court's permanent injunction as it now stands, a mentally incompetent inmate must be removed from the DCJ within 48 hours of entry of the state court order adjudicating the inmate to be incompetent.[2] Rather, the instant dispute centers upon the relative responsibility for these inmates, as between the City Defendants and HRS, upon expiration of the 48 hour period, that is, upon their removal from the DCJ.

The City Defendants argue that state law places the burden upon HRS to care for and keep custody of mentally incompetent in-

---

1. Although this dispute has focused upon inmates who have been declared mentally incompetent to stand trial, it also encompasses those who have gone to trial, but have been found not guilty by reason of insanity.

2. The "48 hour rule" was instituted as a result of the Court's determination that the DCJ lacks

adequate medical facilities and personnel to care for mental incompetents. The rule also applies to the Jacksonville Correctional Institution and Fairfield House in light of the Court's determination that those facilities, like the DCJ, lack adequate medical facilities and personnel to care for mental incompetents.

mates. They maintain that to fulfill this duty, HRS is obligated to either assume custody of the inmates within 48 hours of entry of the state court order of commitment or pay the expense of housing the inmates at University Hospital or another appropriate facility pending availability of bed space at a state institution. The Court agrees with the City Defendants.

Florida law provides the controlling legal authority for resolution of this dispute.[3] The state court orders of commitment, the Florida Rules of Criminal Procedure, and Chapter 916 of Florida Statutes all contain specific provisions bearing on the question at issue. A perusal of these three sources of state law leads to only one conclusion— the responsibility of caring for and keeping custody of mentally incompetent inmates lies with the Florida Department of Health and Rehabilitative Services.

An appropriate point to commence our analysis of the Florida commitment process for mentally incompetent inmates is at the beginning, that is, with an examination of the state court order adjudicating the inmate to be mentally incompetent to stand trial. These orders generally serve two important functions. First, as noted, they adjudicate the particular inmate to be mentally incompetent. Second, and of critical importance to this analysis, *they commit the inmate to the custody of HRS.* They accomplish this latter function in no uncertain terms. The relevant language of a typical state court order of commitment reads as follows:

> Defendant is hereby committed to the Department of Health and Rehabilitative Services, and the Sheriff of Duval County shall forthwith transport and deliver defendant to a treatment facility designated by the Department of Health and Rehabilitative Services ....

Order of Commitment entered in *State of Florida v. Joan Charlene Baddour*, Case No. 80–9065CF, Fourth Judicial Circuit Court in and for Duval County, Florida (February 3, 1981).

Several paradigmatic orders of commitment were admitted into evidence as the City Defendants' Composit Exhibit No. 7. Each of these orders contains language similar to that quoted above. It is apparent from these state court orders that once an inmate has been adjudicated mentally incompetent to stand trial, he is committed to the custody of HRS, not the City Defendants. This is not surprising. The state judges are merely complying with the terms of Rule 3.212(b)(1), Florida Rules of Criminal Procedure, which reads as follows:

> If the court decides that a defendant is not mentally competent to stand trial and meets the criteria for involuntary hospitalization set forth by law, *it shall order the defendant to be transferred to a treatment facility as defined in Florida Statutes,* or residential services as set forth in Florida Statutes, or may order that he receive out patient treatment at any other appropriate facility or service on an involuntary basis.

Fla.R.Crim.P. 3.212(b)(1) (Emphasis added).

Florida Statutes § 394.455(11) (1979) defines "treatment facility" as any "state-owned, state-operated, or state-supported hospital, center, or clinic designated by the [D]epartment [of Health and Rehabilitative Services] for the treatment and hospitalization of persons who are mentally ill ...." Understandably, although Rule 3.212(b)(1) specifies three alternative means of commitment for inmates declared mentally incompetent to stand trial, it appears that state judges generally select the most secure option, choosing to commit incompetents charged with criminal offenses to treatment facilities designated by HRS.

Rule 3.212(b)(3) provides that, once a person has been committed to a treatment facility as set forth in Rule 3.212(b)(1), "[t]he treatment facility shall admit the defendant for hospitalization and treatment and may retain and treat the defendant." The Committee Notes to Rule 3.212(b)(3)

---

3. The City Defendants have not alleged that mentally incompetent inmates receive inadequate treatment while housed at University

Hospital. Consequently, no federal constitutional question arises from the fact that such inmates are housed there.

explain that the section "*mandates*, as does the statute, that the treatment facility *must* admit the defendant for hospitalization and treatment." (Emphasis added). These provisions of the Florida Rules of Criminal Procedure track the statutory language of Section 916.13(1), Florida Statutes (1980 Supp.).

It is apparent at this point in the discussion that state law requires HRS to admit for hospitalization and treatment all inmates adjudicated incompetent and found to meet the criteria for involuntary hospitalization set forth in Florida Statutes.[4] Stated in broader terms, it is clear that Florida law places the responsibility of providing for mentally incompetent inmates upon HRS. Counsel for HRS does not vigorously contest that state law places the ultimate burden upon HRS to care for and keep custody of inmates declared incompetent to stand trial. Indeed, in light of the overwhelming legal authority to the contrary, it would be somewhat absurd to adopt such a position. Rather, counsel contends that a Florida statutory provision grants HRS 45 days to assume custody of such inmates.

Florida Statutes § 394.459(1) (1980 Supp.), captioned "Right to Individual Dignity" contains the following sentence: "In criminal cases, a jail may be used as an emergency facility no longer than 45 days." In the final analysis, HRS' entire argument upon the substantive issue involved herein boils down to a reliance on this one sentence. Apparently, HRS interprets this sentence as a legislative stamp of approval upon its routine practice of allowing mental incompetents to languish in county jails, often for periods of weeks, so long as they are removed within 45 days.

The Court does not believe the purpose of Section 394.459(1) was to establish a 45-day grace period for the benefit of HRS, applicable to everyday situations. Rather, it is apparent from the caption "Right to Individual Dignity" that the section was designed to function as a protective proscription for the benefit of a mentally ill person charged with a criminal offense. When faced with an *emergency* situation, HRS can use a jail as an *emergency* facility, but not for longer than 45 days. Unless one is of the view that HRS is in a perpetual state of emergency, it is clear that HRS does not rely upon jails only as "emergency" facilities.

A reading of Florida Statutes § 916.18 (1980 Supp.) buttresses the conclusion that the legislature did not contemplate that jails would be used as facilities to house mental incompetents in the typical situation, but rather only in the unusual situation. Section 916.18(1) expressly states that it is the intent of the legislature that facilities to house dangerous mental patients "... be established and available for use at the earliest possible time ...." Section 916.18(2) is more specific, providing that:

[t]he Department of Health and Rehabilitative Services is *authorized and directed* to locate, establish, and maintain, *by not later than January 1, 1977*, a secure and separate unit or units for the treatment of patients who, under the Florida Rules of Criminal Procedure, have been involuntarily hospitalized for reason of having been determined by the court to be incompetent to stand trial and who have been found by the Department of Health and Rehabilitative Services to have the clear and present potential to escape or to cause severe injury to themselves or others. *The unit or units shall be sufficient*

---

4. Florida Statutes § 394.467(1) (1980 Supp.) sets forth the criteria for involuntary hospitalization:

(1) CRITERIA.—
(a) A person who is acquitted of criminal charges because of a finding of not guilty by reason of insanity may be involuntarily hospitalized pursuant to such finding if he is mentally ill and, because of his illness, is manifestly dangerous to himself or others.

(b) Any other person may be involuntarily placed if he is mentally ill and, because of his illness, is:
1. Likely to injure himself or others if allowed to remain at liberty, or
2. In need of care or treatment which, if not provided, may result in neglect or refusal to care for himself, and such neglect or refusal poses a real and present threat of substantial harm to his well-being.

*to accommodate* the number of patients involuntarily hospitalized under the conditions noted above .... (Emphasis added).

Thus, we find a legislative mandate that HRS establish separate and secure units to hospitalize and treat mentally incompetent inmates who pose a danger to themselves or others by not later than January 1, 1977. This legislative mandate, which HRS has failed to comply with,[5] is evidence of a legislative intent that HRS be prepared to assume custody of mentally incompetent inmates at the time the circuit court judge enters his or her order committing the inmate to a treatment facility designated by HRS. Support for this conclusion is found in the orders of commitment themselves, which invariably command the Sheriff of Duval County to transport the inmate "forthwith" to a treatment facility designated by HRS. The American Heritage Dictionary defines "forthwith" to mean "At once; immediately; without delay." American Heritage Dictionary of the English Language (New College Edition 1976). It is difficult to imagine a word that would more clearly convey the intent of the committing judge.

Moreover, even if one assumes that Section 394.459(1) authorizes HRS to keep mentally incompetent inmates housed in county jails for periods of up to 45 days as a routine practice, the statute has been superseded by this Court's order requiring that

mental incompetents be removed from the DCJ within 48 hours of the state court order of commitment. In other words, the Court's determination that the DCJ, as a matter of federal constitutional law, lacks adequate facilities to house mentally incompetent inmates has the effect of vitiating any state statute that would allow such inmates to be kept there.

This observation leads us back to our point of departure on the discussion relating to the time frame within which HRS must accept physical custody of mentally incompetent inmates, that is, back to the Court's determination that the ultimate responsibility for mentally incompetent inmates lies with HRS; for the real question is not whether state law permits HRS to house mentally incompetent inmates in county jails for periods of up to 45 days, although the Court has expressed its opinion that the statute relied upon by HRS does not stand for that proposition. That question, while it may be relevant with reference to other county jails, is simply not at issue here in light of the Court's order prohibiting mental incompetents from being housed in the DCJ for periods in excess of 48 hours.

Once one takes cognizance of this fact, the argument of HRS loses all persuasive weight. Immediately upon entry of the state court order committing a mentally

---

5. Note that Section 916.18(2) directs that HRS establish "separate and secure" units sufficient to accommodate all persons who satisfy two conditions: first, it is necessary that the person has been found mentally incompetent to stand trial; and second, it is necessary that HRS find the person has "the clear and present danger to escape or to cause severe injury to ... [himself] or others." It is apparent from testimony given by representatives of HRS at the evidentiary hearing that HRS equates the second condition contained in Section 916.18(2) with the standard for involuntary hospitalization set forth in Section 394.467(1)(b). See note 4, *supra.* In other words, rather than make an independent finding that the mental incompetent has the clear and present danger to escape or to cause injury to himself or others, it appears that HRS simply relies upon the finding made by the committing judge that the person meets the criteria for involuntary hospitalization.

This is reasonable in light of the fact that the first criterion for involuntary hospitalization under Section 394.467(1)(b) parallels the second condition found in Section 916.18(2), that is, that the person is likely to cause injury to himself or others. The indication at the evidentiary hearing was that *all* persons who have been found by a circuit judge to be mentally incompetent to stand trial and who meet the criteria for involuntary hospitalization are placed in one of Florida's three separate and secure forensic units—Florida State Hospital, North Florida Regional Treatment Center, or South Florida State Hospital. It logically follows, therefore, that since all such persons are deemed by HRS to meet the conditions of Section 916.18(2) for placement in a separate and secure unit, the failure of HRS to establish adequate separate and secure units to accommodate these persons constitutes a breach of the duty imposed upon it by the legislature.

incompetent inmate for involuntary hospitalization, that inmate becomes a ward of HRS. Although local officials generally retain *physical* custody of the inmate for a period of time following the order of commitment while awaiting his or her transfer to an HRS treatment facility, the inmate is no longer the *legal* responsibility of the local officials. Consequently, the Court holds that, as a matter of state and federal law,[6] HRS must, within the period of time set by the Court, accept physical custody of any inmate of the DCJ who has been declared mentally incompetent to stand trial and who meets the criteria for involuntary hospitalization.

That period of time is presently set at 48 hours. It appearing, however, that 48 hours is too short a period of time in which to process the paper work necessary to effectuate the transfer of an inmate to the physical custody of HRS, that period will be enlarged to 72 hours. Accordingly, Section VI, paragraph 6 of the permanent injunction will be amended to reflect not only the Court's substantive determination regarding the duty of HRS to assume physical custody of a mentally incompetent inmate upon his removal from the DCJ, but also the enlargement of time just discussed.

The response of HRS officials to the Court's determination is easily anticipated. They will undoubtedly throw up their hands and exclaim that while they would like to assume physical custody of the DCJ's mentally incompetent inmates within 72 hours following entry of the state court order of commitment, they simply do not have adequate bed space. This might well be true, but it does not change the result. To begin with, the law is clear that lack of funds or facilities is never an adequate defense to actions charging violations of the United States Constitution. *Gates v. Collier*, 501

F.2d 1291, 1322 (5th Cir. 1974). The City Defendants raised that argument long ago when plaintiffs filed this action challenging conditions of confinement at the DCJ. It was not successful then and it will not be successful now.

The reason the Court will not allow mental incompetents to be housed in the DCJ is because that facility is constitutionally unfit to house such persons. It is the duty of HRS to provide facilities that *are* constitutionally fit to house mental incompetents. To permit a governmental agency to escape its constitutional obligations simply by claiming lack of funds or facilities would amount to constructing an easily accessible detour around the Constitution itself.

Florida statutory law provides a procedure by which HRS can continue to fulfill its duties even though it lacks adequate bed space in state institutions. In fact, it is precisely the same procedure that HRS has forced the City Defendants to undertake. Florida Statutes § 916.18(2), (3) and § 394.-457(3) authorize HRS to enter into contracts for services and facilities necessary to enable HRS to carry out its statutory responsibilities. This includes authorization to contract with private hospitals for bed space, as the City Defendants have been doing, as well as authorization to contract for security services.

■ Counsel for HRS correctly points out that the nature of the relief thus far accorded to the City Defendants is in the nature of mandamus. Mandamus is admittedly an extraordinary remedy and should be invoked only sparingly. Nevertheless, in the instant matter, where there is no other form of remedy that would accord adequate relief to the City Defendants, it is appropriate to rely upon mandamus-type relief. 22 Fla.Jur. *Mandamus* § 16 (1958).[7]

**6.** The decision that the burden is upon HRS to care for mentally incompetent inmates is a matter of state law, but the determination that mental incompetents must be removed from the DCJ shortly after being adjudicated mentally incompetent is a matter of federal law.

**7.** The relief granted by the Court, although in the nature of mandamus, will not consist of an actual writ of mandamus. Writs of mandamus have been abolished in federal courts by Fed.R. Civ.P. 81(b), which provides further, however, that "relief heretofore available by mandamus ... may be obtained by appropriate action or by appropriate motion ...." Thus, as one

Counsel for HRS argues, however, that mandamus is an inappropriate remedy because the action the City Defendants seek to compel HRS to take is discretionary in nature. The law is clear that mandamus is not available to compel public officers to perform purely discretionary acts. *State ex rel. Eichenbaum v. Cochran*, 114 So.2d 797 (Fla.1959); *Rhoades v. Sweet*, 276 So.2d 221 (3d D.C.A.Fla.1973). Nevertheless, the argument of HRS, while it is correct as a statement of general legal principle, must fail as applied to this case; for the duty of HRS to take physical custody of inmates committed to HRS treatment facilities is a ministerial, rather than a discretionary, duty. The relevant language contained in the orders of commitment, the Florida Rules of Criminal Procedure and Florida Statutes is directory in nature. These sources of state law employ words such as "commanded," "mandates," "shall," and "must" when referring to the responsibility of HRS to hospitalize and treat mental incompetents charged with criminal offenses. The only relevant provision of state law that even arguably grants discretion to HRS in taking physical custody of such persons is the language found in Section 394.459(1) prohibiting use of a jail as an emergency facility for longer than 45 days. The Court has already determined that sec-

tion to be patently inapplicable to the instant set of facts.

HRS also posits that financial and/or physical inability to comply are grounds for denial of a writ of mandamus. There is some Florida case law supporting this proposition, although most of it is somewhat dated. *State ex rel. Titus v. Peacock*, 125 Fla. 452, 170 So. 127 (1936); *State ex rel. Burr v. Tavarse & G. R. Co.*, 78 Fla. 329, 82 So. 833 (1919). The cases generally involve situations where performance of the action sought to be compelled would be absolutely impossible, rather than simply impractical or inconvenient. *See, e. g., State ex rel. Ostroff v. Pearson*, 61 So.2d 325 (Fla.1952) (writ compelling the state board of medical examiners to produce examination papers was denied because the respondent board did not have possession of the papers). In the instant case, no showing has been made that it would be impossible for HRS to take physical custody of mental incompetents from the DCJ within the time period specified by the Court. Indeed, it is extremely doubtful that such a showing could be made. It is possible, although doubtful, that the Court's determination will require that the DCJ be given temporary preference over other jails in the transference of

district court concluded, the effect of the rule "is not earthshaking since it merely substitutes in place of the writ practice an action or motion under the *Rules.*" *In re FTC Corporate Patterns Report Litigation*, 432 F.Supp. 274, 280 (D.D.C.1977).

Historically, federal district courts have never had original jurisdiction to issue writs of mandamus. *Covington & Cincinnati Bridge Co. v. Hager*, 203 U.S. 109, 110, 27 S.Ct. 24, 25, 51 L.Ed. 111 (1906); *Knapp v. Lake Shore Railway Co.*, 197 U.S. 536, 541–43, 25 S.Ct. 538, 539, 49 L.Ed. 870 (1905). The situation is different where, as in the case *sub judice*, the Court has acquired ancillary jurisdiction and, therefore, the writ is simply issued in aid of jurisdiction already acquired by other means. *Covington & Cincinnati Bridge Co. v. Hagen, supra*, 203 U.S. at 110, 27 S.Ct. at 25; *Stern v. South Chester Tube Co.*, 378 F.2d 205, 206 (3d Cir. 1967); *Marshall v. Crotty*, 185 F.2d 622, 626 (1st Cir. 1950). In the instant case, the Court is only exercising its duty and authority to enforce and give meaning to Section VI, paragraph 6 of its permanent injunction en-

tered July 17, 1975, as amended by order of January 12, 1981. The law is clear that a court is empowered to enter such orders as are necessary to effectuate the terms of a permanent injunction. *United States v. Hall*, 472 F.2d 261, 265 (5th Cir. 1972).

When the Court amended Section VI, paragraph 6 of the permanent injunction to require that mental incompetents be removed from the DCJ within 48 hours after being adjudicated incompetent, it did not intend that the City Defendants bear the financial burden (amounting to hundreds of thousands of dollars each year) of housing the inmates in University Hospital. The Court's intent, although it was admittedly stated somewhat ambiguously, was that HRS, which has always been a party to this suit, assume physical custody of mental incompetents upon their removal from the DCJ. This intent emerged from the logical, as well as the legal, perspective that the responsibility of caring for such persons properly rested upon HRS inasmuch as HRS maintained statewide facilities capable of housing mental incompetents humanely and securely.

mental incompetents to the physical custody of HRS. Perhaps other jails have facilities adequate to house mental incompetents. Unfortunately, the DCJ does not. The stance HRS assumes with respect to other jails is not a matter before the Court for consideration. In the final analysis, the Court is convinced that HRS can devise a plan that will enable it to comply with the Court's decision. Consequently, because no inability to comply has been shown, this second argument opposing mandamus-type relief must also fail.

■ In addition to the relief that the Court has already decided to grant, the City Defendants request the Court to hold the Secretary of HRS in contempt for violating the terms of the permanent injunction and seek an award of compensatory damages for expenses incurred in housing mental incompetents at University Hospital. The motion for contempt will be denied inasmuch as the terms of the permanent injunction at issue are presently somewhat ambiguous. Of course, following amendment of the permanent injunction in accordance with this opinion, any further violations on behalf of HRS could very well give rise to a contempt citation.

■ As for the motion of the City Defendants for an award of money damages, that too will be denied. Florida law does not provide any basis for an award of damages in a situation such as this. Article X, Section 13 of the Florida Constitution incorporates the common law doctrine of sovereign immunity, authorizing the state to waive immunity by general law if it so desires. The legislature accepted this invitation by enacting Florida Statutes § 768.28 (1979), which permits persons to sue the state for any tort committed by an employee of a state agency or subdivision while acting within the scope of his employment.

A reading of Section 768.28 leads the Court to the conclusion that the Florida Legislature did not intend the statute to encompass actions for injuries sustained by a municipality as a result of acts or omissions attributable to a state agency. Rather, the statute focuses upon more mundane types of torts, i. e., those causing property damage, personal injury or wrongful death. That this is true is apparent from, among other provisions, Section 768.28(1), which provides that the state shall be liable only if a private person would be liable under the same circumstances in accordance with general law of the state. Obviously, there is no set of facts under which a private person could be liable to the City Defendants for refusing to take custody of mentally incompetent inmates committed to HRS.

With the exception of Section 768.28, there is no provision of Florida law that would even arguably confer authority upon this Court to award money damages to the City Defendants. Some states have enacted statutes that allow a plaintiff to recover damages in mandamus proceedings, but in the absence of such a statute damages are not ordinarily recoverable. See 52 Am. Jur.2d *Mandamus* § 495 (1970). There is no Florida mandamus statute that would permit money damages to be awarded in a proceeding of this type.

Thus, in accordance with the foregoing analysis, an order will be entered amending Section VI, paragraph 6 of the Court's permanent injunction, and denying the City Defendants' motions with respect to contempt and compensatory damages.

It will be so ordered.